**Elinor REDFIELD, Appellant/Cross–Respondent,**

v.

**BEVERLY HEALTH AND REHABILITATION SERVICES, INC. and Aequitron Medical, Inc., Respondents/Cross–Appellants.**

No. ED 77730.

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 30, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 19, 2001.

Application to Transfer Denied
May 29, 2001.

John Cook, J. Michael Ponder, Stephen Paul Sokoloff, Law Office of Thomasson, Gilbert, Cook, Remley, Kennett, for Appellant.

Jordan Bernard Cherrick, Joseph Robert Swift, Co Counsel Donald L. James, Stephen Michael Strum, Law offices of Brown & James, Co Counsel Carl J. Geraci, Law office of Sandberg, Phoenix & Von Gontard, St. Louis, for Respondents.

SULLIVAN, Judge.

Elinor Redfield (Appellant) appeals from the trial court's judgment granting the Motions of Aequitron Medical, Inc. (Aequitron) and Beverly Health and Rehabilitation Services, Inc. (Beverly) for New Trial based on intentional nondisclosure by juror LaDonna Hopper (Hopper). We reverse with directions for the trial court to reinstate the judgment.

Appellant is the mother of decedent Mark Jones (Jones). Jones was a ventilator dependent quadriplegic who lived in a nursing home operated by Beverly. On June 24, 1997, at approximately 7:05 a.m., respiratory therapist Sandra Radford (Radford) began to administer a treatment to Jones at the home. Radford completed this treatment between 8:20 and 8:25 a.m. Radford testified that she checked the ventilator circuit before leaving Jones that morning and that it was functioning properly. At 8:35, nurse Penny Whitaker (Whitaker) entered Jones's room and noticed that Jones was cold, clammy and unresponsive. Radford returned to Jones's room and noticed that Jones's supplemental oxygen tube was lying disconnected on the floor. Appellant was notified that Jones's breathing apparatus had been unplugged for forty-five minutes, and that Jones was experiencing problems and would be transported to the hospital. On June 27, 1997, Jones had no brain activity. Appellant had Jones's life support disconnected and he died on June 27, 1997.

Appellant brought a strict products liability and negligent design action against Aequitron, the designer of Jones's ventilator, and a medical negligence cause of action against Beverly and Radford. The jury returned a verdict in favor of Appellant in the amount of $2,000,000. Aequitron and Beverly filed Motions to View Jury List seeking information about jurors to determine whether or not any of the jurors had failed to disclose information during voir dire. The trial court granted the motions. Aequitron and Beverly then filed Motions for New Trial based on the allegation that six of the twelve jurors had failed to disclose relevant information during voir dire pertaining to prior claims and/or lawsuits. A post-trial hearing was held wherein three of the six jurors were questioned. The trial court granted the Motions for New Trial based on its finding that Hopper intentionally failed to disclose

that she was involved in a lawsuit against Bi State filed in late 1995. Hopper had sustained injuries to her back and neck when she was a passenger on a Bi–State bus that was involved in a collision. The lawsuit settled in April 1996. After all expenses were paid out, including medical expenses and attorney's fees, Hopper received $500 from the settlement.

In her point on appeal, Appellant maintains that the trial court erred in granting the Motions of Aequitron and Beverly for New Trial because the trial court's finding of intentional nondisclosure by Hopper was unsupported by the evidence and testimony.[1]

■ The trial court's findings regarding whether a juror's explanation for nondisclosure during voir dire is reasonable are given great weight and will not be disturbed on appeal unless the trial court abused its discretion. *Brines By and Through Harlan v. Cibis*, 882 S.W.2d 138, 139 (Mo.banc 1994). Intentional nondisclosure occurs: 1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that the juror's purported forgetfulness is unreasonable. *Heinen v. Healthline Management, Inc.*, 982 S.W.2d 244, 247–248 (Mo.banc 1998). Finding that a juror had a "reckless disregard" for the responsibility to disclose information during voir dire is tantamount to intentional nondisclosure. *Id.* at 248. A finding of intentional nondisclosure is tantamount to a per se rule mandating a new trial. *Id.* However, such findings must be supported by the record. *Id.*

Unintentional disclosure exists where the experience forgotten was insignificant or remote in time, or where the venireperson reasonably misunderstands the questions posed. *Williams By and Through Wilford v. Barnes Hosp.*, 736 S.W.2d 33, 36 (Mo.banc 1987).

In the instant case, the relevant questions posed by defense counsel at voir dire were:

Is there anyone who is currently a plaintiff or defendant in a civil matter? A civil matter like what we have here today where somebody is suing somebody else? Whether you're a plaintiff, whether you're the one doing the suing or whether you're a defendant, you're the one being sued?

Let's not talk about currently, but let's talk about the past. In the first group of twelve, is there anyone in the group of twelve in the past that was a plaintiff or a defendant in a civil lawsuit?

Now, I think Mr. Strum asked about being a plaintiff or a defendant and Ms. Simmons we found out that you had a claim but you did not really file a lawsuit, but has anyone else ever had a claim for money damages, not a lawsuit, maybe it didn't get that far but has anyone ever in the panel had a claim that sought money damages?

Hopper did not respond to any of these inquiries at voir dire.

At the post-trial hearing, the trial court found that Hopper did not state that she had forgotten the cases which she failed to disclose. "Cases" include not only the Bi State litigation, but also a workers' compensation matter where her former employer, McDonald's, filed a workers' compensation report of injury when Hopper injured herself at work, and an automobile

---

**1.** Aequitron's contention that Appellant's point on appeal does not comply with Missouri Rule of Civil Procedure 84.04(d) is without merit.

accident in which Hopper, as an underaged driver, backed an automobile into another driver. The court apparently considered these two additional cases in coming to its decision: "Rather [Hopper's] failure to relate all of the instances here would seem to indicate a reckless disregard for her responsibilities."

■ We disagree. In the automobile accident case, Hopper was neither a named plaintiff nor defendant. Hopper's father was the named defendant. Hopper had no claim for money damages because of the accident. Therefore, Hopper was not obligated to disclose this case in response to the above questions posed during voir dire. In the workers' compensation case, Hopper herself did not file a claim. Rather her employer filed a Report of Injury. Hopper did not have a lawyer, nor did she receive any compensation. Therefore, Hopper was not required to disclose this case during voir dire. In fact, at the post-trial hearing, Hopper testified that she did not even remember the incident in question.

Turning to the Bi–State litigation, the trial court specifically found that Hopper did not indicate that she had forgotten the Bi–State case. However, the record shows that Hopper testified at the post-trial hearing as follows:

Q. [Counsel for defense] Okay. Now, these questions about whether anyone had been a plaintiff or defendant in a civil lawsuit, why did you not bring this matter to the lawyers and to the Court's attention, this injury and lawsuit in relating to the Bi State bus accident?

A. [Hopper] I really don't know. The lawyer did everything. I really didn't have any input. He handled everything for me.

Q. When you were sitting there in the courtroom and they were asking these questions did this incident in the Bi State bus and this lawsuit did that enter into your mind?

A. No, it didn't.

Q. It did not?

A. No.

■ We find that Hopper's nondisclosure was both unintentional and reasonable, in light of her testimony at the post-trial hearing that she did not recall the incident during voir dire as well as the fact that the incident occurred five years prior to the instant proceeding, and Hopper received a nominal amount of money in settlement after the proceedings concluded.

■ Where nondisclosure is found to be both unintentional and reasonable, the relevant inquiry becomes whether the juror's presence did influence the verdict or may have influenced the verdict so as to prejudice the party seeking a new trial. *Rogers v. Bond,* 880 S.W.2d 607, 611 (Mo. App. E.D.1994). One of the factors for consideration is the materiality and relevance of the undisclosed experience. *Id.* As the similarity between the undisclosed experience and the case at hand increases, so does the inference of bias and prejudice, the impairment of counsel's ability to make informed peremptory challenges, and the incredulity of the juror's purported forgetfulness. *Id.*

■ We find that Hopper's undisclosed experience was immaterial. Hopper's failure to disclose a Bi–State bus accident injury is dissimilar to a lawsuit involving wrongful death due to a defective ventilator and negligence in providing healthcare. Accordingly, Hopper's presence did not influence the verdict so as to prejudice Aequitron and Beverly.

For the foregoing reasons, we find that the trial court's conclusion that Hopper had not forgotten the Bi–State incident

and that Hopper's nondisclosure was unreasonable to be an abuse of discretion. Accordingly, Appellant's point on appeal is granted. The trial court's judgment granting the Motions of Aequitron and Beverly for New Trial based on intentional nondisclosure of Hopper is reversed.

■ Aequitron presents five points on cross-appeal. An initial matter that needs to be addressed is the jurisdiction of this Court to hear Aequitron's points on cross-appeal. Although the trial court's judgment granting a new trial removed any adverse judgment that might have aggrieved Aequitron, *Community Title Co. v. Roosevelt Fed. Sav. and Loan Ass'n*, 796 S.W.2d 369, 370 (Mo.banc 1990), we now reverse the trial court's judgment granting a new trial, and Aequitron is ostensibly aggrieved. Thus we now address Aequitron's points on cross-appeal.

Aequitron's first point on cross-appeal contends that the trial court should have granted it a new trial because there was no substantial evidence to establish that the ventilator was defective or that there was a causal relationship between the alleged defects in the ventilator and Jones's death in that: (1) there was no substantial evidence that the alleged susceptibility to electromagnetic interference (EMI) or the age and complexity of the microprocessor rendered the ventilator defective or unreasonably dangerous or caused it to fail; and (2) there was no substantial evidence that an independent backup system or an independent robotic monitoring system would have prevented Jones's death. Aequitron maintains that a new trial is required if we find that Appellant failed to establish sufficient evidence to support either of these theories because it is impossible to determine which theory the jury relied on when it found in Appellant's favor. *See Saupe v. Kertz*, 523 S.W.2d 826, 830 (Mo.banc 1975).

■ In determining whether or not Appellant made a submissible case, we view the evidence and inferences therefrom in the light most favorable to Appellant, and disregard all contrary evidence. *Community Title*, 796 S.W.2d at 371. A review of the record and Appellant's expert witnesses' testimony reveals that there was sufficient evidence to establish that the ventilator was defective. Appellant's experts Dr. Feinberg (Feinberg), and Dr. Dale Rummer (Rummer), testified that the ventilator was unreasonably dangerous. Both Feinberg and Dennis Tureson, an employee of Aequitron, testified that as an electronic device, the ventilator was susceptible to EMI. Rummer testified that the ventilator was susceptible to failure due to the age of the technology incorporated into its mechanisms and the complexity of the interconnections necessary to run the machine. Feinberg testified that the absence of a redundant backup breathing system made the machine unreasonably dangerous because the user depends upon the machine to sustain his life. Rummer testified that the absence of an independent redundant alarming system made the machine dangerous for the same reason. Rummer testified that the ventilator was susceptible to EMI failure or electronic device failure because there were more interconnections in the ventilator than necessary. We find the record contained sufficient evidence that the ventilator was defective.

■ A review of the record and Appellant's expert witnesses' testimony reveals that there was also sufficient evidence to establish that there was a causal relationship between the alleged defects in ventilator and Jones's death. Whitaker and Radford testified that the ventilator was not working when they discovered Jones not breathing. As a result, Jones's chest was not rising or falling; the ventilator was

silent when there was normally a whooshing sound when the machine was working; and there was no audible alarm sounding. Appellant's expert Dr. McGinty testified that Jones died from oxygen deprivation. We find the record contained sufficient evidence that the ventilator's defective condition caused Jones's death. Based on the foregoing, Point one is denied.

In its second point, Aequitron argues that the trial court erred in not granting Aequitron a new trial on the alternative ground that the trial court abused its discretion in sustaining Appellant's objection to Aequitron's evidence that the LP10 ventilator performed adequately during EMI testing, because the trial court erroneously concluded that Aequitron failed to disclose this evidence before trial in response to interrogatory no. 5 of Appellant's third set of interrogatories. Aequitron contends that it correctly answered interrogatory no. 5 in that the interrogatory requested only testing that resulted in warnings and cautions in Aequitron's user manual, and the testing did not result in any such warnings. Aequitron maintains it was prejudiced by this error because Feinberg testified that EMI caused the ventilator to fail and that the ventilator was defective because it did not contain an independent backup system in the event of such a failure.

The trial court has broad discretion to control discovery. *Wilkerson v. Prelutsky*, 943 S.W.2d 643, 647 (Mo.banc 1997). This discretion extends to the trial court's choice of remedies in response to the non-disclosure of evidence or witnesses during discovery. *Id.* at 648. Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion. *Id.*

Aequitron maintains that its interrogatory answer was accurate and responsive, in that the question did not inquire as to EMI testing on the ventilator that did **not** result in the warnings and cautions in the manual, and therefore it was not required to disclose such results. The trial court did not seem to think Aequitron's answer was responsive to Appellant's interrogatory, as it excluded Aequitron's evidence that the LP10 ventilator performed adequately during EMI testing. The trial court may, in the sound exercise of its discretion, admit or exclude evidence challenged in trial on the basis that it was undisclosed in answers to interrogatories. *State ex rel. Missouri Highway and Transp. Comm'n v. Vitt*, 785 S.W.2d 708, 712 (Mo.App. E.D.1990). We do not find that the trial court abused its discretion in finding that Aequitron's answer to Appellant's interrogatory no. 5 was deficient. Point two is denied.

In its third point, Aequitron argues the trial court erred in not granting Aequitron's motions for directed verdict and judgment notwithstanding the verdict because there was no substantial evidence to establish that the ventilator was allegedly defective or that there was a causal relationship between the alleged defects in the ventilator and Jones's death in that: (1) there was no substantial evidence that the alleged susceptibility to EMI or the age and complexity of the microprocessor rendered the ventilator defective or unreasonably dangerous or caused it to fail; and (2) there was no substantial evidence that an independent backup system or an independent robotic monitoring system would have prevented Jones's death.

This argument is the same as that presented in Aequitron's point one. For the reasons stated in our discussion of Aequitron's point one, point three is denied.

In its fourth point, Aequitron argues that the trial court erred in not entering a remittitur order because the jury's $2,000,000 damages award far exceeds any amount supportable by the evidence and far exceeds fair and reasonable compensation in that: (1) there was no evidence of any pecuniary or economic loss; (2) the substantial compensatory damages award for Jones's death necessarily represents compensation for Appellant's loss of companionship; (3) Jones was under permanent medical care and had a life expectancy of ten years; and (4) the award is excessive when compared with awards given and approved in comparable Missouri wrongful death cases.

■■■■■■ The trial court has broad discretion in ordering remittitur, and its decision whether or not to reduce damages will not be disturbed on appeal absent an abuse of discretion "so grossly excessive that it shocks the conscience and convinces this court that both the trial judge and the jury have abused their discretion." *Botanicals on the Park, Inc. v. Microcode Corp.*, 7 S.W.3d 465, 470 (Mo.App. E.D. 1999) (quoting *King v. Unidynamics Corp.*, 943 S.W.2d 262, 268 (Mo.App. E.D. 1997)). In reviewing whether a verdict is excessive, we are "limited to a consideration of the evidence which supports the verdict excluding that which disaffirms it." *Id.*, (quoting *Smith v. Wal–Mart Stores, Inc.*, 967 S.W.2d 198, 208 (Mo.App. E.D. 1998)). "There is no precise formula for determining whether a verdict is excessive, and each case must be considered on its own facts with the ultimate test being what fairly and reasonably compensates plaintiff for the injuries sustained." *Smith*, 967 S.W.2d at 208 (quoting *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 211 (Mo. 1991)).

■■■■■■ Section 537.090,[2] entitled, **Damages to be determined —by jury—factors to be considered,** provides for damages in wrongful death cases:

In every action brought under section 537.080, the trier of the facts may give to the party or parties entitled thereto such damages as the trier of the facts may deem fair and just for the death and loss thus occasioned, having regard to the pecuniary losses suffered by reason of the death, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which those on whose behalf suit may be brought have been deprived by reason of such death and without limiting such damages to those which would be sustained prior to attaining the age of majority by the deceased or by the person suffering any such loss. In addition, the trier of the facts may award such damages as the deceased may have suffered between the time of injury and the time of death and for the recovery of which the deceased might have maintained an action had death not ensued. The mitigating or aggravating circumstances attending the death may be considered by the trier of the facts, but damages for grief and bereavement by reason of the death shall not be recoverable.

The jury has extraordinarily wide discretion in determining the amount of recovery in wrongful death cases. *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 174 (Mo. App. W.D.1997).

**2.** All statutory references are to RSMo (1994), unless otherwise indicated.

■ Aequitron compares the $2,000,000 award for Appellant's loss of companionship and Jones's pain and suffering to compensatory damage awards in other wrongful death cases. Aequitron maintains that "[t]he damages awarded in this case far exceed the damages affirmed in every published appellate opinion in Missouri, including those cases in which, unlike here, there was evidence of substantial economic losses." Although awards given and approved in comparable cases is a factor to be looked at in considering remittitur, *see Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 657 (Mo.App. W.D.1997), we find such comparison is not conclusive as to whether or not the award is "so grossly excessive that it shocks the conscience and convinces this court that both the trial judge and the jury have abused their discretion." *Botanicals on the Park, Inc.*, 7 S.W.3d at 470.

■ Aequitron also argues that $2,000,000 in compensatory damages is excessive because Jones's life expectancy was only ten years and he did not contribute financially to Appellant. Again, this argument does not take into account Appellant's loss of companionship of her son, nor the damages Jones may have suffered between the time the ventilator failed and his time of death, nor any of the other enumerated factors in the wrongful death statute. Based on the facts before us, we do not find the compensatory damages award to be so grossly excessive that it shocks the conscience. Point four is denied.

■ In its fifth point, Aequitron argues the trial court erred in not amending the judgment because the trial court should have reduced the entire $2,000,000 judgment to $917,000 in that the judgment should reflect a reduction equal to the equitable share of Radford's settlement ($200,000) and a reduction of an additional amount ($883,000) commensurate with Beverly's liability in excess of the health care provider's cap in Section 538.215; if a remittitur is ordered, the judgment should be amended consistent with these principles. In addition, Aequitron asserts the Court should hold that Aequitron has a right of contribution against Beverly for the amount of the judgment it must pay in excess of its proportionate share ($400,000 of the current $2,000,000 judgment or, alternatively, its proportionate share of the remitted judgment) because the statutes in Chapter 538 do not alter Aequitron's right to contribution provided by Section 537.060.

■ Aequitron designed the ventilator at issue in this case. Appellant's cause of action against Aequitron sounded in strict products liability and negligent design. Sections 538.205 to 538.230 apply to actions against health care providers only. *Stalcup v. Orthotic and Prosthetic Lab, Inc.*, 989 S.W.2d 654, 660 (Mo.App. E.D. 1999).[3] There are public policy reasons behind the enactment of Chapter 538. In *Mahoney v. Doerhoff Surgical Services, Inc.*, 807 S.W.2d 503, 507 (Mo. banc 1991), the Missouri Supreme Court stated: "It is readily understood from the history and text of Chapter 538 that the enactment is a legislative response to the public concern over the increased cost of health care and the continued integrity of that system of essential services." To give effect to the legislative intent of Chapter 538, the protections of the chapter must be provided to the health care providers as listed under Section 538.205(4), as well as to "any other person or entity that provides health care

**3.** Conversely, the statutory products liability provisions under Sections 537.760 to 537.765, which were enacted in 1987 at the same time as Section 538.300, are inapplicable to health care providers. *Budding v. SSM Healthcare System*, 19 S.W.3d 678, 681 (Mo.banc 2000).

services under the authority of a license or certificate." Section 538.220(4); *P.S. v. Psychiatric Coverage, Ltd.*, 887 S.W.2d 622, 627 (Mo.App. E.D.1994). Aequitron is, admittedly, not a health care provider as defined under the statute. *See* Section 538.205; *Psychiatric Coverage, Ltd.*, 887 S.W.2d at 627. Neither does Aequitron provide health care services. *See Psychiatric Coverage, Ltd.*, 887 S.W.2d at 627. Accordingly, the statutory provisions Aequitron cites in its fifth point do not apply to it. Point five is denied.

Beverly also presents a point on cross-appeal. Beverly contends the trial court erred in denying Beverly's motions for directed verdict and for judgment notwithstanding the verdict because: (1) Appellant was precluded from arguing res ipsa loquitur by her presenting evidence showing the actual cause of the event and arguing specific negligence with respect to Beverly; and (2) Appellant failed to present substantial evidence supporting the submission of res ipsa loquitur.

 Normally, in a medical malpractice case, a plaintiff is required to establish: (1) an act or omission by the defendant that was not in keeping with the degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession; and (2) that such negligence or omission caused the plaintiff's injury. *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 615 (Mo.banc 1995). However, the doctrine of res ipsa loquitur exists to obviate the need for direct proof of negligence, and allows cases submitted under the doctrine to proceed to the jury even in the absence of direct proof of negligence. *Zumwalt v. Koreckij*, 24 S.W.3d 166, 168 (Mo.App. E.D.2000). In order to invoke the doctrine of res ipsa loquitur, a plaintiff must demonstrate: (1) the occurrence resulting in injury does not

ordinarily happen if those in charge use due care; (2) the instrumentalities that caused the injury are under the care and management of the defendant; and (3) the defendant possesses either superior knowledge of or means of obtaining information about the cause of the occurrence. *Id.; Bass v. Nooney*, 646 S.W.2d 765, 768 (Mo. banc 1983).

 Once a plaintiff establishes the three elements of res ipsa loquitur, an inference of the defendant's negligence arises. *Zumwalt*, 24 S.W.3d at 168. A jury can draw an inference of negligence without expert medical testimony. *Id.* In fact, the doctrine of res ipsa loquitur in a medical malpractice case requires that laypersons know, based upon their common knowledge or experience, that the cause of the plaintiff's injury does not ordinarily exist absent the doctor's negligence. *Id.* at 169. Once the inference of negligence created by res ipsa loquitur is established, it "will defeat a motion for summary judgment even though the defendant presents evidence tending to establish absence of negligence." *Id.,* quoting *Graham v. Thompson*, 854 S.W.2d 797, 801 (Mo.App. W.D.1993).

 A plaintiff who sustains an injury as a result of an unusual occurrence is not precluded from submitting her case under the res ipsa doctrine merely because the evidence shows that the occurrence could have been caused *by any one of several* different acts of specific negligence. *Calvin v. Jewish Hosp. of St. Louis*, 746 S.W.2d 602, 607 (Mo.App. E.D. 1988). Beverly acknowledges that if a plaintiff pleads general negligence she may submit evidence of specific negligence and still be allowed to submit on a res ipsa loquitur theory *unless* her evidence shows the precise and specific negligence cause. *City of Kennett v. Akers*, 564 S.W.2d 41, 46 (Mo.banc 1978). Beverly then contends

that Appellant introduced specific acts of negligence with respect to Beverly at trial, and therefore was precluded from proceeding on a res ipsa loquitur theory.

Appellant did maintain at trial that Beverly was specifically negligent in, for example, as Beverly asserts, failing to monitor Jones properly. However, Appellant did not show the precise and specific cause of negligence leading to Jones's death. *Id.* There is a difference. Appellant's expert testified that Jones died of lack of oxygen. However, the specific cause, or combination of causes, leading to that deprivation of oxygen is unknown. Jones's being deprived of oxygen is not something that normally occurs absent someone's negligence. The disconnection of Jones's supplemental oxygen tube, which was lying on the floor, is not something that normally occurs without someone's negligence. There was testimony to this fact. These allegations of specific negligence do not preclude proceeding on a res ipsa theory under both *Calvin* and *City of Kennett,* and they do not go so far as to show the precise and specific negligence cause leading to Jones's death

Beverly also maintains that Appellant did not establish that Beverly had exclusive control over Jones or the instrumentality which caused his death. Beverly supports this contention by arguing that the last person, presumably, in the room with Jones before the incident was Radford. Beverly claims that Radford, the respiratory therapist, was the only individual who had the right and authority to adjust any settings on the ventilator. Respiratory therapists were not on staff at the nursing home.

The record shows that Radford was not the only one who had control over Jones's breathing ability and the ventilator. Beverly nursing personnel did as well. Whitaker testified that the nursing staff, in conjunction with the respiratory therapist, were responsible for oxygenating or keeping Jones oxygenated.

Beverly finally maintains that Appellant failed to establish that Beverly had superior knowledge of or means of obtaining information about the cause of Jones's death, because Beverly's employees were not in Jones's room until Whitaker entered his room and found Jones nonresponsive. In other words, Radford was the last person in the room with Jones. Again, Radford was not the only one with superior knowledge or means of obtaining information about the cause of Jones's death. Whitaker was immediately involved in the efforts to discover what was wrong with Jones and attempt to revive him. Whitaker was admittedly responsible for the oxygenation of Jones. Appellant was not at the nursing home at the time of the incident and had no knowledge as to the incident nor its cause.

Whether the doctrine of res ipsa loquitur applies in a particular case is a question that is within the exclusive province of the trial court. *Guffey v. Integrated Health Services of Kansas City,* 1 S.W.3d 509, 514 (Mo.App. W.D.1999). In determining whether the facts and circumstances of a particular case allow for the application of res ipsa loquitur, the trial court may apply the wisdom it has gained from common experience and should consider the character and nature of the incident and not the mere fact of its occurrence. *Id.* We find the trial court applied its wisdom well in allowing Appellant to submit her case on a theory of res ipsa loquitur. Beverly's point on cross-appeal is denied.

For the foregoing reasons, the trial court's judgment granting the Motions of Aequitron and Beverly for New Trial based on juror nondisclosure is reversed

with directions for the trial court to reinstate the judgment.

MOONEY, P.J., and SIMON, J., concur.